## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MICHAEL JAMES KAMANN, | CIVIL NO. 11-1261 (JNE/AJB) |
| PLAINTIFF, | |
| V. | REPORT & RECOMMENDATION<br>ON CROSS MOTIONS<br>FOR SUMMARY JUDGMENT |
| MICHAEL J. ASTRUE, COMMISSIONER OF<br>SOCIAL SECURITY, | |
| DEFENDANT. | |

---

James R. Mayer, Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for Plaintiff.

B. Todd Jones, United States Attorney, David W. Fuller, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant.

---

## <u>INTRODUCTION</u>

Plaintiff Michael James Kamann disputes the unfavorable decision of Defendant Commissioner of Social Security (the "Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court, Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.1-2.

For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (Docket No. 21) be denied and the Commissioner's Motion for Summary Judgment (Docket No. 23) be granted.

## FACTS

### I.  BACKGROUND

Mr. Kamann was 43 years old at the time of the ALJ's decision.  (*See* Tr. 23.)  Mr.

Kamann has a high school education.  (Tr. 140.)  Mr. Kamann has past relevant work as a lumber

handler (heavy, unskilled), surveyor helper (medium, semi-skilled), and construction worker

(very heavy, unskilled).  (Tr. 225.)

Mr. Kamann stopped working on March 15, 2001, the alleged disability onset date, when

his seasonal job ended to which he was not called back.  (Tr. 134.)  At the time of the alleged

disability onset date, Mr. Kamann was 35 years old.  (Tr. 18.)

### II.  RELEVANT MEDICAL EVIDENCE

#### A.  Mr. Kamann's Treatment Records

##### 1.  Mr. Kamann's back issues

Mr. Kamann reports injuring his back in 1995 while lifting a heavy rock at work as a

stonemason.  (Tr. 268.)  Mr. Kamann reports that he had back surgery in 1997 to undergo fusion

at L3-5, 4-5, and L5-S1.  (Tr. 233, 268, 369.)  The surgery helped briefly, but Mr. Kamann

continued to have low back and leg pains.  (Tr. 233.)  He had the hardware from his surgery

removed in 1998, without improvement.  (Tr. 233, 369.)

On August 12, 1998, Dr. Lynn Parry saw Mr. Kamann for follow-up after removal of the

hardware associated with his back surgery.  (Tr. 227.)  Dr. Parry reviewed an MRI, which

showed continued anterolisthesis of L5 on S1.  (Tr. 227.)  Dr. Parry noted that Mr. Kamann

continued to have back pain.  (Tr. 227.)  Dr. Parry concluded that Mr. Kamann was at maximum

medical improvement and placed Mr. Kamann on the following permanent work restrictions: no

twisting, no crawling, no climbing, no lifting greater than 20 pounds continuously, and no continuous standing or sitting.  (Tr. 177.)

On August 19, 1998, Mr. Kamann was seen by Dr. Jeffrey Kleiner for review of an MRI conducted to evaluate low back pain.  (Tr. 176.)  Review of the MRI showed solid arthrodesis through the anterior interbody areas, with a question of a failing to unite at the L5-SI area anteriorly, and a solid posterior fusion.  (Tr. 176.)

In association with Mr. Kamann's previous application for disability benefits, Dr. Roger Ralston performed a consultative physical examination of Mr. Kamann on November 5, 2002 at the request of the state agency.  (Tr. 233.)  Dr. Ralston noted that Mr. Kamann had lived with his significant other, to whom he had been engaged at one time, for the last 13 years, and together they had raised her daughter.  (Tr. 234.)  At that time, Mr. Kamann reported pain in his low back and both legs, which was worse with any activity or persistent posture.  (Tr. 233.)  He reported that any activity, even standing or walking, aggravated his pain and that as a result he had become inactive over the last several years.  (Tr. 233.)  Mr. Kamann also reported that he had been in a motor vehicle collision in 2000 in which he hurt his neck, from which he had pain in his neck, shoulders, and hands, especially the left shoulder.  (Tr. 233.)  Dr. Ralston noted that Mr. Kamann had no prior medical evaluation for this impairment and had used no medication. (Tr. 233.)

Dr. Ralston's physical examination showed Mr. Kamann had good strength in the hands, forearms, and shoulders, with some crepitation and loss of motion in the left shoulder.  (Tr. 234.) Mr. Kamann had tingling and numbness into his hand when palpating the nerve at the wrist or at the nerve just above the elbow bilaterally.  (Tr. 234.)  His range of motion of his hips, knees, ankles, and feet was normal.  (Tr. 235.)  Dr. Ralston noted that Mr. Kamann walked with a

slightly wide-based stance, but was able to walk on his toes and heels.  (Tr. 235.)  Mr. Kamann

had good range of motion in his cervical spine, but no motion in his lumbar spine.  (Tr. 234-35.)

Mr. Kamann's stiffness extended into the mid-thoracic spine, resulting in an awkward gait.  (Tr.

235.)  Dr. Ralston noted that Mr. Kamann had trouble getting on and off the examining table,

assuming the recumbent posture, and getting up, and that Mr. Kamann appeared to be

uncomfortable, wincing, and in pain during the examination.  (Tr. 235.)  Strength and reflex in

Mr. Kamann's lower extremities were normal.  (Tr. 235.)  Dr. Ralston diagnosed chronic back

pain syndrome, with failed multilevel lumbar fusion and disc replacement; bilateral hand pain,

likely carpal tunnel syndrome; and mild to moderate cervical pain consistent with cervical

degenerative disc disease.  (Tr. 235.)  Dr. Ralston noted that Mr. Kamann had no neurological

loss at present, which would suggest that he would benefit from additional surgery.  (Tr. 235.)

X-rays revealed that the upper lumbar spine was normal in appearances with no fractures or

destructive lesions seen.  (Tr. 237.)

Over the next five years, Mr. Kamann sought no treatment for his back.

On August 5, 2008, Mr. Kamann saw Dr. George Rounds to have disability forms

completed and also complained of back pain.  (Tr. 365, 369.)  Dr. George noted that Mr.

Kamann walked with a gait that showed some stiffness or pain in his low back.  (Tr. 369.)

Mr. Kamann saw Dr. Rounds again on August 20, 2008 for a complaint of back pain.

(Tr. 368.)  Mr. Kamann had some discomfort with touch in the low back and his back pain was

worse with position changes.  (Tr. 368.)  Mr. Kamann had good strength and reflexes in his

upper extremities.  (Tr. 368.)  X-rays showed no abnormalities in the thoracic spine other than

mild scoliosis, some loss of normal cervical lordosis in the cervical spine; and evidence of fusion

at three levels in the lumbar spine.  (Tr. 367-68.)  Dr. Rounds noted that Mr. Kamann's pain

seemed to be muscle traction pain and referred Mr. Kamann to Dr. Olson for pain relief procedures. (Tr. 368.)

On October 2, 2008, Mr. Kamann saw Dr. Paul Olson for evaluation of his chronic pain. (Tr. 346.) Mr. Kamann reported pain throughout his spine and significant headaches exacerbated with the pain. (Tr. 346.) He reported that any activity may cause some discomfort, including lying down, getting up, twisting, bending, and standing. (Tr. 346.) Dr. Olson diagnosed isolated para-spinal sympathetic mediated-type pain and administered a SCS alpha stimulation trial. (Tr. 346.) Mr. Kamann experienced a marked reduction in symptoms with the alpha stimulation trial. (Tr. 346.) His headache resolved and no specific location of pain could be identified except at the L5 level. (Tr. 346.) Dr. Olson recommended that Mr. Kamann proceed with alpha stimulation and biofeedback, given his excellent response to the alpha stimulation trial and his refusal to proceed with injections. (Tr. 346.) Mr. Kamann had two additional alpha stimulation treatments on October 29 and November 14, 2008, with similarly good results. (Tr. 360-62.) There is no record of any further treatments, despite Mr. Kamann being approved by his health insurance for 10 treatments through the end of the year. (Tr. 358.)

Mr. Kamann next saw Dr. Rounds on February 6, 2009 for follow-up on back pain. (Tr. 389.) Mr. Kamann denied problems with his legs, but stated that he used a cane to walk. (Tr. 389.) Dr. Rounds' notes indicate that Mr. Kamann was applying for disability benefits and had been advised to see a neurosurgeon for a surgical consultation. (Tr. 389.)

On November 19, 2009, Mr. Kamann called Dr. Rounds' office to request a referral to see a neurologist. (Tr. 379.) Mr. Kamann stated that he had a social security hearing scheduled for January of the following year and needed the referral prio1r to the hearing. (Tr. 379.) Mr. Kamann saw Dr. Rounds on December 9, 2009 to obtain the neurosurgery referral. (Tr. 377.)

Dr. Rounds concluded that Mr. Kaman would be better served by a functional capacity assessment.  (Tr. 377.)

2.   Mr. Kamann's mental health issues

During Mr. Kamann's November 2002 physical consultative examination conducted by Dr. Ralston, Mr. Kamann reported being considerably depressed, with feelings of lack of self-value, particularly related to his inability to return to work as a stonemason.  (Tr. 234-35.)

On April 7, 2003, Mr. Kamann was admitted to Miller Dwan Medical Center with a diagnosis of psychosis.  (Tr. 263.)  His mother reported that Mr. Kamann lived across the street from her with his fiancée, that both he and his fiancée had lived with her for a time, and that Mr. Kamann was building a large garage across the street from her and was doing all the work himself.  (Tr. 265.)  His mother reported that Mr. Kamann had become paranoid and may have threatened a neighbor.   (Tr. 263.)  Upon examination, Mr. Kamann was alert, cooperative, and oriented to all spheres; his speech was of normal rate and rhythm.  (Tr. 263.)   His thought processes were at times illogical with some looseness of associations.  (Tr. 263.)  Mr. Kamann denied being a risk to himself or anyone else and demanded discharge.  (Tr. 263-64.)  Mr. Kamann did not meet criteria for involuntary stay or commitment and was discharged the following day.  (*See* Tr. 251, 264.)

On April 21, 2003, Mr. Kamann was admitted to University Medical Center – Mesabi in Hibbing, Minnesota under a police hold.  (Tr. 251.)  He was assessed as having hallucinations and paranoid ideation.  (Tr. 252.)  He was exhibiting paranoid behavior and believed that people were out to target him.  (Tr. 251.)  A friend reported that Mr. Kamann had threatened to kill him. (Tr. 251.)  His mother and sister reported his long-term drug use and a concern for his behavior. (Tr. 259.)  Mr. Kamann refused a urine drug screen, blood draws, and all other lab work, causing

the physician to believe he was using drugs.  (Tr. 251, 253.)  The physician described Mr.

Kamann as vague, circumstantial, and tangential, with difficulty staying in one place, and

angering quite easily but able to calm down.  (Tr. 253, 256.)  Mr. Kamann was cooperative.  (Tr.

253.)  The physician considered him to be over delusional.  (Tr. 254.)  Mr. Kamann denied any

hallucinations or any desire to harm himself or anyone else.  (Tr. 251, 254.)  He was released at

the end of a 72-hour hold period without meeting criteria for commitment.  (Tr. 251, 241.)  The

physician was unable to rule out psychosis induced by drugs.  (Tr. 251.)

On April 29, 2003, Mr. Kamann was again admitted to the University Medical Center -

Mesabi in Hibbing, Minnesota at the request of Itasca County Court, brought in by Itasca County

Sheriff's deputies for evaluation prior to a court-ordered confinement hearing on May 1.  (Tr.

241-43.)  Mr. Kamann initially refused a urine drug screen, blood alcohol level, complete blood

count testing, and a metabolic panel, leading the examining provider to believe he was using

drugs.  (Tr. 241, 243.)  Mr. Kamann reported that there were people trying to get him.  (Tr. 243.)

Mr. Kamann was oriented to person, place and time, his speech was tangential and rambling, and

he appeared to have acute psychosis, with preoccupation with the thought that someone was

trying to harm him.  (Tr. 244.)  The physician noted that Mr. Kamann was an "alert, interactive,

tangential fellow who seems to be vague and detached from what is occurring around him."  (Tr.

242.)  Substance abuse could not be ruled out as the cause of his paranoid thinking.  (Tr. 241.)

Mr. Kamann admitted to a history of abusing amphetamines and acknowledged that he

sometimes had delusional responses when using amphetamines.  (Tr. 241.)  He eventually tested

positive for cannabis, but continued to refuse the metabolic panel.  (Tr. 241.)  Mr. Kamann

became generally pleasant and cooperative as the substance was leaving his system.  (Tr. 241.)

Mr. Kamann's final diagnosis was psychosis, probably induced by substance use, cannabis abuse, and amphetamine abuse.  (Tr. 241.)

During Mr. Kamann's teleclaim with the Social Security Administration, Mr. Kamann told the representative that he had had several mental health commitments due to chemical use and abuse.  (Tr. 131.)

### B.    Mr. Kamann's Disability Report and Testimony

As part of the application process, Mr. Kamann submitted a Disability Report.  (Tr. 133-41.)  Mr. Kamann reported the following conditions that limited his ability to work:  "back injury, depression, anxiety and panic attacks."  (Tr. 134.)  Mr. Kamann described how these conditions limited his ability to work:

> I am unable to do the work that I use[d] to.  I am on permanent restrictions.  I
> don[']t get along with other people and usually get in trouble with my employers
> for being aggressive with other employees.  My body gets tired and I can[']t do
> the work.

(Tr. 134.)  Mr. Kamann indicated that he stopped working on March 15, 2001 when he finished his seasonal work and thereafter was not called back to work.  (Tr. 135.)  He further remarked that he had been addicted to methamphetamines for 15 years and "may be considered an alcoholic and an abuser of a wide variety of drugs."  (Tr. 141.)

Although Mr. Kamann identified his mother as a relative who knew about his conditions on his initial Disability Report, when the Administration sent him a third party function report for a relative, friend, or other person to fill out less than a month later, Mr. Kamann claimed that there was no one who could provide any answers, that he had no family or friends, and sent the form back blank.  (Tr. 133, 142-152.)

On a function report, Mr. Kamann identified his daily activities as including walking to a table and sitting, feeding his dogs, and eating.  (Tr. 156.)  Mr. Kamann claimed to do laundry

two times per year, wash his hair eight times per year, and wash dishes two times per year, stating that he did not like to be clean.  (Tr. 157-59.)  Mr. Kamann stated that he did not go shopping and begged for food.  (Tr. 158-59.)  Mr. Kamann responded "none of your b[usi]ness" to questions regarding his hobbies and interests.  (Tr. 160.)  He claimed to hate people, go nowhere, and be scared of everyone.  (Tr. 160-62.)  Mr. Kamann stated that his attention span was four and a half seconds or less and that he would not take instructions from anyone.  (Tr. 161.)

At the hearing, Mr. Kamann testified before the Administrative Law Judge (ALJ) that he could not work because he "can't get [his] back up straight."  (Tr. 23.)  He testified that he had two breaks in his L-5 vertebrae and spina bifida occulta in the spinous process of the same vertebrae.  (Tr. 26.)  He had fusion surgery, in which his L-5 vertebrae was left one degree forward from his S-1 vertebrae.  (Tr. 27.)  Thereafter, he developed slight scoliosis and his L-2 disc was giving out.  (Tr. 27.)  Mr. Kamann testified, "I can't get my body to stand up straight because of the fusion.  I'm always forward.  When I bend down, I cannot get my body to go back straight.  I can't.  It doesn't.  I just can't do it."  (Tr. 27.)  Mr. Kamann acknowledged that he formerly used methamphetamines and marijuana, but stated that he no longer uses them at all.  (Tr. 24.)  With respect to medication, Mr. Kamann testified:  "I can't take any medications.  I'm sober.  I went through treatment and I refuse all pain medications.  I don't want to get involved with it.  I'm not on any medication."  (Tr. 27.)  Mr. Kamann's representative indicated to the ALJ in response to the ALJ's questions that Mr. Kamann's mental impairments were non-severe.  (Tr. 24.)

### C.       Physical Consultative Examination

At the request of the state agency, Mr. Kamann underwent a consultative examination by

Dr. Roger Ralston on December 4, 2007.  (Tr. 268-71.)  Dr. Ralston had conducted Mr.

Kamann's first consultative examination in 2002.  Mr. Kamann reported continuous pain in his

lower back, made worse by lifting, twisting, turning, leaning forward, or other activity.  (Tr.

268.)  The pain was somewhat better if he used good posture and stood straight and with aspirin

or medication.  (Tr. 268.)  Dr. Ralston noted that Mr. Kamann was not currently involved in

medical care, had no recent evaluation or prescription medications, and was involved in no

physical therapy or alternative treatments; Mr. Kamann reported that he could not afford such

treatments.  (Tr. 268.)

Upon examination, Mr. Kamann had no dorsal spinous process tenderness in the cervical,

thoracic, or lumbar spine.  (Tr. 270.)  He walked upright and was able to walk on his toes and

heels and could move on and off the examination table without pain-related behavior.  (Tr. 270.)

His reflexes and strength were normal.  (Tr. 270.)  Mr. Kamann had marked limited motion in

his lumbar spine, with no lateral movement, no movement with twisting, and no bending in the

lumbar spine.  (Tr. 270.)  Dr. Ralston noted that Mr. Kamann's pain was not associated with

specific evidence of nerve rootlet compression or neurologic loss and that he moved about the

room comfortably.  (Tr. 270.)  Mr. Kamann also had neck and arm pain consistent with cervical

disc degeneration and his motor vehicle injury to the cervical spine, but with no specific

objective confirmation of neurologic loss.  (Tr. 271.)  Dr. Ralston noted that Mr. Kamann

appeared to move more comfortably than he had upon his previous examination five year before,

but that he continued to have limitations related to ongoing lumbar pain.  (Tr. 271.)  Dr. Ralston

concluded that the likelihood of significant improvement in the future seemed low.  (Tr. 271.)

### D.      Residual Functional Capacity Assessment

Dr. Aaron Mark completed a physical residual functional capacity assessment of Mr. Kamann on January 3, 2008.  (Tr. 325-32.)  Dr. Mark reviewed the consultative examination conducted by Dr. Ralston and the rest of the record and concluded that Mr. Kamann had the following residual functional capacity: Mr. Kamann can lift 20 pounds occasionally and 10 pounds frequently; he can stand, walk, or sit about six hours in an eight-hour work day, with normal breaks; his ability to push or pull is unlimited; he can climb a ramp or stairs frequently; he can climb a ladder, rope, or scaffold occasionally; and he can balance, stoop, kneel, crouch, and crawl frequently.  (Tr. 325-32.)  Another agency reviewing physician, Dr. Gregory Salmi, reviewed Dr. Mark's assessment and concurred with his assessment.  (Tr. 343-45.)

### E.      Mental Consultative Examination

On December 17, 2007, psychologist Dr. Jeffrey Toonstra conducted a mental health consultative examination of Mr. Kamann.  (Tr. 302-05.)  Mr. Kamann reported that he did not get along well with people, avoided contact with people, and stayed home all the time.  (Tr. 302.) Mr. Kamann stated that he had been unable find work in Talmoon, Minnesota, where he lived, due to his back problems and lack of education.  (Tr. 302.)  He told Dr. Toonstra that he dislikes humanity and considered himself an "extremely dangerous person," although he had never hurt people or animals.  (Tr. 302-03.)  Mr. Kamann reported feeling anxiety around other people and having panic attacks daily.  (Tr. 303.)  Mr. Kamann told Dr. Toonstra that he suffered from depression, considered himself to be "paranoid-psycho," suffered from anxiety and panic attacks, had obsessive-compulsive disorder, an "established dislike for most people," and a history of methamphetamine addiction, and was an alcoholic and abuser of a variety of drugs.  (Tr. 303-04.)

Mr. Kamann reported that his daily activities included care for his dogs, cannabis use, watching television, and drinking wine.  (Tr. 304.)  He reported that he had no positive relationships with family and lived alone.  (Tr. 304.)  Mr. Kamann told Dr. Toonstra that he had a history of drinking and cocaine, methamphetamine, and cannabis use and had used methamphetamine for 20 years prior to undergoing treatment.  (Tr. 304.)  Mr. Kamann reported that he is able to take care of himself, but chooses not to wash or clean because he has no reason to do it.  (Tr. 304.)

Dr. Toonstra noted that Mr. Kamann was cooperative and exhibited no threatening behavior, but made many comments about being uncooperative, difficult to deal with, and threatening.  (Tr. 304.)  Dr. Toonstra also noted that Mr. Kamann was dramatic in his speech and behavior with regard to his circumstances.  (Tr. 305.)  Dr. Toonstra found Mr. Kamann's stream of consciousness to be spontaneous and scattered, but coherent and goal directed.  (Tr. 304.)  Mr. Kamann displayed no blatant evidence of thought disorder or psychotic disturbance.  (Tr. 304.)  His affect appeared euthymic and he appeared to have good reality contact, being able to easily find the office.  (Tr. 304.)  Mr. Kamann displayed an awareness of current events and political viewpoints.  (Tr. 304.)  Dr. Toonstra assessed Mr. Kamann and having between borderline and low average functioning intelligence.  (Tr. 304.)

Dr. Toonstra found evidence of personality disorder in the areas of cognition, interpersonal, affectivity and impulsivity, with evidence of antisocial personality disorder and some paranoia, although it did not seem to be clearly related to a specific disorder.  (Tr. 304.)  Mr. Kamann appeared more angry or agitated than sad.  (Tr. 305.)  Dr. Toonstra indicated that he suspected malingering of psychological symptoms.  (Tr. 304.)  Dr. Toonstra noted that Mr. Kamann's description of anxiety and panic attacks were less clear and he suspected that

secondary gain motivated Mr. Kamann's description of symptoms.  (Tr. 305.)  Dr. Toonstra

found that given the limited scope of the evaluation, it was difficult to tease apart diagnostic

criteria, Mr. Kamann's extensive use of methamphetamine and other chemicals, the potential

malingering of symptoms, and the possibility of a formal thought disorder.  (Tr. 305.)

Dr. Toonstra diagnosed Mr. Kamann with adjustment disorder, unspecified, rule out

malingering and personality disorder, not otherwise specified.  (Tr. 305.)  Dr. Toonstra

concluded that Mr. Kamann's mental capacities to understand, remember, and follow

instructions appeared limited, that Mr. Kamann appeared to have no difficulty with attention and

concentration or with carrying out work-like tasks with reasonable persistence and pace, and that

his ability to respond appropriately to brief and superficial contact with co-workers and

supervisors appeared compromised due to difficulty getting along with people.  (Tr. 305.)  Dr.

Toonstra found that Mr. Kamann would not likely tolerate the stress and pressure of entry-level

work places.  (Tr. 305.)

The state agency's reviewing psychologist, Dr. J. Pressner, reviewed Dr. Toonstra's

evaluation and the rest of the record on December 29, 2007.  (Tr. 308.)  Dr. Pressner concluded

that there was insufficient evidence to make a decision with respect to Mr. Kamann's current

mental functioning.  (Tr. 308.)  Dr. Pressner gave no weight to Dr. Toonstra's opinions, finding

that Dr. Toonstra's opinion was based upon Mr. Kamann's self-reports, which were not credible.

(Tr. 320.)  For example, Dr. Toonstra made no diagnosis regarding drug and alcohol abuse

problems, although Mr. Kamann reported daily marijuana use and wine drinking; Mr. Kamann

made multiple allegations of severe psychiatric problems but presented no evidence of them

during the interview; and Dr. Toonstra's assessment that Mr. Kamann had limited ability to

understand, remember, and carry-out simple instructions was inconsistent with his finding of

borderline to average intelligence range.  (Tr. 320.)  Dr. Pressner found Mr. Kamann's self-reports to be not credible because of the disconnect between the self-reports and his actual presentation in the session and the probable drug and alcohol abuse components of his problems. (Tr. 320.)  Dr. Pressner found Mr. Kamann's self-report on the disability questionnaire to be clearly exaggerated and contradictory—for example, Mr. Kamann denied any form of human contact, yet indicated that he obtained food from begging and somehow obtained wine and marijuana for daily use.  (Tr. 320.)  Dr. Pressner concluded that Mr. Kamann's condition may well be related to drug and alcohol abuse and that his actual level of functioning and limitations could not be ascertained.  (Tr. 320.)  Another state agency reviewing psychologist, Dr. Ray M. Conroe, concurred with Dr. Pressner's assessment, noting that Mr. Kamann smoked marijuana daily, part of the consultative examination diagnosis was rule out malingering, Mr. Kamann had no prescriptions or any type of medical care for his problems, and concluding that there was insufficient information to determine Mr. Kamann's true degree of impairment.  (Tr. 340-42.)

## F.     Vocational Expert's Testimony

At the administrative hearing, the ALJ posed a hypothetical to Edward Utities, a vocational expert, regarding an individual who can lift "20 pounds occasionally, 10 pounds frequently, sit/stand six hours, push/pull is unlimited, occasional ladders, ropes, scaffolding. Everything else is frequent."  (Tr. 25.)  Mr. Utities testified that such an individual could not perform Mr. Kamann's past work as a lumber handler, surveyor/helper, or construction worker. (Tr. 25.)  Mr. Utities testified that such an individual could perform other jobs classified as light, unskilled work, including wrapping and packing occupations.  (Tr. 25.)  Mr. Utities testified that there were more than 8,000 such jobs in Minnesota.  (Tr. 25-26.)

### III.     PROCEDURAL HISTORY AND ALJ'S DECISION

Mr. Kamann applied for DIB and SSI on November 5, 2007, alleging an inability to perform any substantial gainful activity since March 15, 2011 due to his disabling conditions.[1] (Tr. 101, 103-15.)  Mr. Kamann was last insured for DIB on December 31, 2003.[2]  (Tr. 130.) The applications were denied by the Commissioner initially on January 4, 2008 and upon reconsideration on May 13, 2008.  (Tr. 8, 40-42.)  Thereafter, Mr. Kamann filed a written request for a hearing.  (Tr. 64.)  The hearing was held on January 13, 2010.  (Tr. 20-30.)

On February 8, 2010, ALJ Michael D. Quayle denied Mr. Kamann's application for DIB and SSI benefits.  (Tr. 8-19.)  The ALJ concluded that Mr. Kamann is not disabled under sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act.  (Tr. 9-19.)  The ALJ found that Mr. Kamann has not engaged in substantial gainful activity since March 15, 2001, the alleged onset date.  (Tr. 10.)  The ALJ also found that Mr. Kamann has the following severe impairments: chronic back pain syndrome (with failed multilevel lumbar fusion and disc replacement), psychosis (possibly induced by substance abuse), adjustment disorder (unspecified), rule out malingering, personality disorder not otherwise specified, history of cannabis abuse, and history of amphetamine abuse.  (Tr. 10.)  The ALJ determined that Mr. Kamann does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404.1567(b).  (Tr. 11.)  The ALJ concluded

---

[1]     Mr. Kamann previously applied for DIB benefits on October 15, 2002.  (Tr. 119.)  The claim was denied.  (Tr. 119.)

[2]     With respect to his DIB application, Mr. Kamann was required to prove he was disabled prior to the date he was last insured for DIB.  *See* Social Security Ruling (SSR) 83-10.  With respect to his SSI application, Mr. Kamann is not entitled to SSI benefits prior to the date that he filed an SSI application.  *See* 20 C.F.R. §§ 416.330, 416.335.  Thus, the relevant time frame for consideration of Mr. Kamann's DIB claim is from his alleged disability onset date (March 15, 2001) through his date last insured (December 31, 2003) and the relevant time frame for consideration of Mr. Kamann's SSI claim is from his effective SSI filing date (November 5, 2007) through the date of the ALJ's decision (February 8, 2010).

that Mr. Kamann has the residual functional capacity to perform a range of light work as defined

in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following specific limitations: lifting up to

20 pounds occasionally and 10 pounds frequently; standing, walking, or sitting each up to 6

hours in an 8-hour workday; no more than occasional climbing of ladder/ropes/scaffolds; and is

further limited to unskilled work.  (Tr. 14.)  The ALJ found that Mr. Kamann's medically-

determinable impairments could reasonably be expected to cause his alleged symptoms, but that

Mr. Kamann's statements concerning the intensity, persistence, and limiting effects of those

symptoms are not credible.  (Tr. 15.)  The ALJ found that Mr. Kamann is unable to perform any

past relevant work.  (Tr. 18.)  The ALJ concluded that there are jobs that exist in significant

numbers in the national economy that Mr. Kamann is capable of performing, and as a result, Mr.

Kamann has not been under a disability from March 15, 2001 through the date of the decision.

(Tr. 18-19.)

On April 11, 2011, the Appeals Council denied Mr. Kamann's request for review (Tr. 1-

3), making the ALJ's decision final for the purposes of judicial review.  *See* 20 C.F.R. §§

404.967, 404.981.  This Court has jurisdiction to review the decision of the ALJ.  42 U.S.C. §

405(g).

Mr. Kamann filed the present Complaint on May 16, 2011.  (Docket No. 1.)  Mr. Kamann

moved for summary judgment on January 26, 2012.  (Docket No. 21.)  The Commissioner

moved for summary judgment on March 12, 2012.  (Docket No. 23.)

## ANALYSIS

## I.    LEGAL FRAMEWORK

To be entitled to DIB and SSI, a claimant must be disabled.  42 U.S.C. §§ 423(a)(1)(E),

1382(a)(1).  A "disability" is an "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.

The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.  20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v).  The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner.  *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a).  Ordinarily, the Commissioner can rely on the testimony of a vocational expert to satisfy his burden.  *Long v. Chater*, 108 F.3d 185, 188 (8th Cir.1997).

## II.   STANDARD OF REVIEW

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).

"Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

In reviewing the record for substantial evidence, the court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213. Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199. Therefore, even if Mr. Kamann's impairments support a claim for disability insurance benefits, the court must affirm if there is substantial evidence to support the ALJ's conclusion to the contrary. *Flynn v. Chater,* 107 F.3d 617, 620 (8th Cir. 1997). The court cannot reverse the Commissioner's decision "merely because substantial evidence exists in the record that would have supported a contrary outcome." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

## III.   REVIEW OF THE ALJ'S DECISION

Mr. Kamann contends that the ALJ's assessment of his residual functional capacity to do unskilled work is not supported by substantial evidence in light of his mental impairments. Mr. Kamann also contends that the ALJ failed to properly develop the record. Finally, Mr. Kamann contends that the ALJ's credibility determination is not supported by substantial evidence.

### A.   The ALJ's Development of the Record

Mr. Kamann argues that the ALJ did not properly develop the record because the opinions of the consultative examiner, Dr. Toonstra, and the state agency's reviewing psychologist, Dr. Pressner, are incomplete. Both psychologists concluded that there was insufficient evidence on which to make a determination regarding Mr. Kamann's actual level of

functioning and limitations.  (Tr. 305, 320.)  Mr. Kamann also argues that the ALJ failed to question Mr. Kamann sufficiently during the administrative hearing with regard to his mental impairments, noting that the hearing was only 13 minutes long.  Mr. Kamann contends that the ALJ should have sent Mr.  Kamann for additional psychological evaluation, called a medical expert to testify at the hearing, or asked further questions of Mr. Kamann during the hearing.

An ALJ has a duty to develop the record fully and fairly.  *Cox v. Astrue,* 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004).  Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'"  *Wilcutts v. Apfel,* 143 F.3d 1134, 11387 (8th Cir. 1998).  "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis."  *Mouser v. Astrue,* 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

An ALJ may order medical examinations and tests when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled.  *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir.1994) (citation omitted); *see also* 20 C.F.R. § 404.1519a(a)(1) ("The decision to purchase a consultative examination . . . will be made after we have given full consideration to whether the additional information needed is readily available from the records of your medical sources.").  20 C.F.R. § 404.1519a(b) provides that "[a] consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on . . . [the] claim." *Id.*  For example, a consultative examination should be purchased when "[t]he additional evidence needed is not contained in the records of your medical sources."  20 C.F.R. § 404.1519a(b)(1).  Additionally,

20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony, stating that ALJs "may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s). . . ."

Under the Act, Mr. Kamann has the burden of proving disability. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a). In addition, the regulations clearly state that the claimant has the responsibility for providing medical evidence: "You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you are disabled." 20 C.F.R. § 404.1512. An ALJ has a basic obligation to determine the facts relevant to his decision and to learn a claimant's own version of the facts. *See Heckler v. Campbell*, 461 U.S. 458, 471 (1983) (Brennan, J., concurring); *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987). However, the ALJ's duty to develop the record does not require him to act as the claimant's advocate. *See Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994).

Here, the ALJ thoroughly reviewed Mr. Kamann's medical records and fully considered the opinions of consultative and non-examining sources. Mr. Kamann relies on *Battles v. Shalala*, 36 F.3d 43 (8th Cir. 1994) to argue that the ALJ failed to develop the record, but that case is distinguishable from the instant facts. Here, unlike in *Battles*, the Administration ordered a consultative psychological examination of Mr. Kamann, an agency psychologist reviewed the record and conducted a psychiatric review technique, and the ALJ evaluated Mr. Kamann's mental impairments according to the procedures set forth in 20 C.F.R. § 416.920. Mr. Kamann argues that additional psychological evaluation should have been conducted, but the state agency had already sent Mr. Kamann for a psychological evaluation, which was further evaluated by two

20

agency psychologists.  Mr. Kamann does not explain what evidence additional psychological

testing could have provided.  In addition, although the hearing conducted by the ALJ was brief,

the length of the hearing is not dispositive.  *See Battles*, 36 F.3d at 45.  Further, Mr. Kamann's

representative agreed at the hearing that Mr. Kamann's mental impairments were not severe.

(Tr. 24.)  Given the evidence in the record, and this Court's deference to the ALJ in deciding

whether the record is fully developed, the Court finds that the ALJ did not err by not calling a

medical expert, sending Mr. Kamann for additional psychological evaluation, or asking Mr.

Kamann additional questions at the hearing.  The ALJ met his basic duty to fully and fairly

develop the record as to the material issues and properly evaluated the record as a whole in

finding Mr. Kamann not disabled.

### B.    The ALJ's Residual Functional Capacity Determination

In steps four and five, the Commissioner assesses an individual's RFC.  20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  RFC is defined as the most a claimant can do despite

the limitations of the individual's impairments.  20 C.F.R. § 404.1545(a)(1).  An ALJ has the

responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of

the relevant evidence.  *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005); *see also*

*Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir. 2000).  Relevant evidence for determining a

claimant's RFC includes "'medical records, observations of treating physicians and others, and

an individual's own description of his [or her] limitations.'"  *Lacroix v. Barnhart,* 465 F.3d 881,

887 (8th Cir. 2006) (quoting *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004)).

However, "RFC is a medical question, and an ALJ's finding must be supported by some medical

evidence."  *Guilliams,* 393 F.3d at 803 (citing *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th

Cir. 2004)).

The ALJ concluded that Mr. Kamann has the RFC to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with certain specific limitations, and that Mr. Kamann was further limited to unskilled work.  (Tr. 14.)  Mr. Kamann challenges the ALJ's assessment only to the extent that the ALJ found that Mr. Kamann could perform unskilled work. Mr. Kamann argues that the ALJ erred in giving no weight to Dr. Toonstra's consultative examination evaluation and by giving more weight to Dr. Pressner's non-examining opinion than that given to Dr. Toonstra's.  Mr. Kamann argues that the ALJ improperly drew his own inferences from the medical records to form an opinion of Mr. Kamann's RFC rather than relying on Dr. Toonstra's opinion.  Mr. Kamann contends that there is extensive evidence in the record regarding Mr. Kamann's inability to function around other people.

The ALJ's decision to give no weight to the opinion of Dr. Toonstra was reasonable.  The opinions of consultative examiners are not entitled to controlling weight.  20 C.F.R. § 404.1527(d)(2).  In addition, the ALJ may rely upon the opinions of non-examining sources. 20 C.F.R. § 416.927(d) and (f).  It is the duty of the ALJ to weigh the evidence of record.  *See e.g.*, *Richardson v. Perales,* 402 U.S. 389, 399 (1971).  Opinions of consultative examiners may be discredited by other evidence in the record.  The ALJ reasonably rejected Dr. Toonstra's opinions, which were based on subjective reports by Mr. Kamann that the ALJ found were not credible and which were inconsistent with the record as a whole.  Mr. Kamann argues that this case is like *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), where the court found that the ALJ had improperly discounted the opinion of a treating physician and used the ALJ's own interpretation of medical records that the claimant did much better when taking prescribed medication.  *See Shontos*, 328 F.3d at 427.  However, here the ALJ did not base his evaluation of Dr. Toonstra's opinion on the ALJ's own interpretation of a medical finding.  Rather, the ALJ

noted the numerous inconsistencies in Dr. Toonstra's report and between the report and the record as a whole. For example, Dr. Toonstra noted that Mr. Kamann was cooperative and non-threatening despite claiming to be uncooperative and threatening; Dr. Toonstra's mental status findings—including that Mr. Kamann's affect was euthymic, Mr. Kamann appeared to be in good contact with reality and current events, and Mr. Kamann displayed no evidence of thought disorder—are inconsistent with disabling mental limitations; and Dr. Toonstra's report was inconsistent with Mr. Kamann's course of treatment.

The Court finds that substantial evidence on the record as a whole supports the ALJ's RFC determination limiting Mr. Kamann to unskilled work but finding no further limitations based on Mr. Kamann's social functioning. The ALJ noted that Mr. Kamann had no difficulties interacting with examining or treating sources, appearing to be pleasant, polite and cooperative. (*See, e.g.*, Tr. 241, 304, 354.) In addition, Mr. Kamann maintained long-term stable relationships during the period in question, living with his fiancée for over 13 years and together raising her child. (*See* Tr. 234, 265.) Other than the hospitalizations in April 2003 that were apparently the result of Mr. Kamann's substance abuse, Mr. Kamann has undergone no treatment for mental health problems. Further, even the evaluation that Mr. Kamann argues should be given more weight, that of Dr. Toonstra, concluded that there was cause for concern and suspicion that Mr. Kamann was malingering his psychological symptoms. Although Mr. Kamann argues that there is substantial evidence of his inability to function around other people, that evidence comes from Mr. Kamann's self-reports, which the ALJ found lacked credibility as discussed below. Finally, the ALJ's conclusions are consistent with those of Dr. Pressner, the agency psychologist.

### C.     Mr. Kamann's Credibility

This Court "defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000). The ALJ need not explicitly discuss each factor. *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." *Id.* (quotation omitted). "The inconsistencies between [a claimant's] allegations and the record evidence provide sufficient support for the ALJ's decision to discredit [a claimant's] complaints of pain." *Guilliams*, 393 F.3d at 803.

The ALJ concluded that, although Mr. Kamann's medically-determinable impairments could reasonably be expected to produce his symptoms, Mr. Kamann's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 17.) The ALJ noted that the weight of the objective medical findings do not corroborate Mr. Kamann's allegations of severely

disabling limitations.  Mr. Kamann had been seen relatively infrequently for his impairments despite his allegations of disabling symptoms and he did not follow up with specialists.    In addition, Mr. Kamann had taken no pain medication for allegedly disabling pain, despite taking medication for other conditions.  The ALJ also noted that Mr. Kamann's work history shows he worked only sporadically prior to alleged onset date.  The ALJ found that these factors outweighed Mr. Kamann's description of his daily activities, particularly considering that there was some evidence that Mr. Kamann's self-reports of his limited daily activities were exaggerated.

Mr. Kamann objects to the ALJ's reliance on the fact that Mr. Kamann sought almost no medical care for his alleged disabling symptoms, arguing that the reason for this is that he could not afford to do so because he did not have medical insurance.  However, the record shows that Mr. Kamann sought treatment for various other non-severe impairments, including for tooth pain, a foot infection, abdominal pain, a dog bite, and strep throat.  (*See* Tr. 286, 354, 356, 365, 372, 380.)  The fact that Mr. Kamann chose to seek treatment for non-disabling conditions discredits his contention that he could not seek treatment for the allegedly disabling conditions due to lack of financial means.  In addition, the record does not support Mr. Kamann's contention that he began seeking frequent medical treatment in 2008 and 2009 for back pain upon obtaining medical insurance.  In fact, although Mr. Kamann was referred to stimulation treatments to alleviate back pain in August 2008, obtained approval for 10 such treatments between the period October and December 2008, and experienced relief from his symptoms following the treatments, Mr. Kamann went to only two treatments.  (Tr. 346, 358, 360-62.) Further, the record reflects that Mr. Kamann sought no treatment for mental health problems.

Mr. Kamann also objects to the ALJ's reliance on his failure to follow up with specialists, claiming that he did try to obtain a referral to a neurosurgeon.  However, the record suggests that Mr. Kamann's requests for a referral were motivated by his desire to bolster his application for benefits, as he contacted Dr. Rounds in the months before his administrative hearing and stated that he needed a neurosurgery consultation prior to his administrative hearing.  (Tr. 377, 379.)  In addition, Mr. Kamann argues that his lack of pain medication should not be considered in determining his credibility, as he cannot take such medications because of his addiction issues.  However, the record reflects that Mr. Kamann took pain medications for tooth pain despite his claims that he could not take such medications for his allegedly disabling conditions.  (Tr. 380-81.)

Mr. Kamann also faults the ALJ's discounting of his self-reports of his allegedly extremely-limited daily activities.  The Court finds that the ALJ was reasonable in finding that the other factors outweighed Mr. Kamann's self-reports of his daily activities.  Many of Mr. Kamann's self-reports are contradictory.  For example, Mr. Kamann denied any form of human contact, yet somehow obtained wine and marijuana to use on a daily basis.  (*See* Tr. 158-62, 304, 320.)  Mr. Kamann claimed on his function report that he did not drive, yet drove to his appointment with Dr. Toonstra and told Dr. Toonstra, in denying that he was under the influence during the appointment, that he did not drive when he used substances.  (*See* Tr. 158, 304, 320.)

The record shows that the ALJ properly considered the *Polaski* factors in reaching his credibility determinations.  Substantial evidence in the record as a whole supports the ALJ's determination that Mr. Kamann lacked credibility.

**<u>RECOMMENDATION</u>**

The Court finds that the ALJ's decision finding Mr. Kamann not disabled is supported by substantial evidence on the record as a whole.  The ALJ properly developed the record and substantial evidence support the ALJ's RFC determination and credibility finding.  For the foregoing reasons, **IT IS HEREBY RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment [Docket No. 21] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 23] be **GRANTED**.


Dated: July 11, 2012                                s/ Arthur J. Boylan
                                                    Chief Magistrate Judge Arthur J. Boylan
                                                    United States District Court


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before  July 25  , 2012.